## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **JERRY CHARLES HAYNES,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION** |
| **NANCY A. BERRYHILL,** | ) | **NO. 4:17-CV-00896-KOB** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

On July 27, 2011 the claimant, Jerry Haynes, applied for disability insurance benefits under Title II of the Social Security Act. (R. 237-39). The claimant alleged disability beginning October 15, 2009 because of depression, suicidal thoughts, low blood pressure, knee pain, recurrent ear infections, and recurrent MRSA infections. (R. 88-91). The Commissioner denied the claimant's application for disability insurance benefits on November 17, 2011. (R. 124-29). The claimant filed for a hearing before an Administrative Law Judge, and the ALJ held an initial hearing February 26, 2014. (R. 133-34).

On May 9, 2014, the ALJ denied the claimant's application, finding that the claimant was not disabled at any time during the relevant period and was, therefore, ineligible for social security benefits. (R. 100-14). The Appeals Council vacated the ALJ's decision and remanded with instructions for the ALJ to (1) consider additionally collected evidence and (2) pose

complete hypothetical questions to the Vocational Expert. (R. 121-22). The ALJ held a second hearing on May 4, 2016. (R. 79).

On August 11, 2016, the ALJ again denied claimant's application. (R. 19-32). The Appeals Council subsequently denied the claimant's request for review on August 16, 2016. (R. 1-6). Accordingly, the second ALJ decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following four issues for review:

(1) whether substantial evidence supports the ALJ's determination that the claimant's subjective testimony lacked credibility;

(2) whether the ALJ accorded proper weight to the opinions of treating physician Dr. Jose Oblena and consulting physician Dr. David Wilson;

(3) whether substantial evidence supports the ALJ's Residual Functional Capacity (RFC) determination that the claimant could perform work in the national economy;

(4) whether substantial evidence supports the ALJ's non-reliance on the Medical Vocational Guidelines and limitations included in the hypotheticals he posed to the vocational expert.

## STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if

substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

This court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## III. LEGAL STANDARD

*Subjective Pain Testimony*

An ALJ considering a claimant's pain and other subjective testimony must first determine whether the claimant has "evidence of an underlying medical condition." *Holt v. Sullivan*, 921 F.2s 1221, 1223 (11th Cir. 1991); *see also* 20 C.F.R. § 404.1529. Once a claimant shows an underlying medical condition, he must show either: (1) "objective medical evidence that confirms the severity of the alleged pain arising from that condition," or (2) "that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt*, 921 F.2d at 1223 (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)). Subjective pain testimony can satisfy the pain standard, but only if medical evidence supports that subjective testimony such that is "credited." *See Bloodsworth v. Heckler*, 703 F.2d 1223, 1242 (11th Cir. 1983); *Benson v. Schweiker*, 652 F.2d 406, 408-09 (11th Cir. 1981).

If an ALJ discredits a claimant's subjective testimony, he must articulate his reasons. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The ALJ may consider the claimant's daily activities to discredit pain testimony. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).

*Medical Opinions*

An ALJ must state with particularity and explain the weight he gave different medical opinions. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). The ALJ must give "[t]he testimony of a treating physician…substantial or considerable weight unless 'good cause' is

shown to the contrary." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). But, a doctor who examines a patient on only one occasion is not considered a "treating physician." *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987).

Additionally, when objective medical evidence does not support the treating physician's opinion or it is wholly conclusive, the ALJ may discount the opinion. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004). When the ALJ articulates specific reasons for failing to give controlling weight to a treating physician's opinion, and substantial evidence supports those reasons, the ALJ does not commit reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). The ALJ is "concerned…with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinions of the legal consequences of his condition." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

Additionally, a claimant applying for disability insurance benefits must demonstrate that he was disabled "on or before" the date he was last insured. *Moore*, 405 F.3d at 1211 (citing 42 U.S.C. § 423(a)(1)(A)). A medical opinion or examination that occurs after the "relevant disability period" may be a "retrospective diagnosis that [is] not entitled to deference unless corroborated by contemporaneous medical evidence of a disabling condition." *Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 832 (11th Cir. 2011).

*Residual Functional Capacity*

A claimant's RFC is the work that an individual "is still able to do despite the limitations caused by his…impairments." *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (citing 20 C.F.R. § 404.1545(a)). The ALJ must first assess the claimant's functional limitations and restrictions and then express his functional limitations in terms of exertional levels. *See Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009); *Freeman v. Barnhart*, 220 F. App'x 957, 959–60

(11th Cir. 2007); *see also Bailey v. Astrue,* 5:11–CV–3583–LSC, 2013 WL 531075 (N.D.Ala. Feb.11, 2013).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including:

> medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.

SSR 96–8p at *4–*5.

*Grid Rules and Vocational Experts*

After the ALJ has determined that a person can no longer perform his former occupation because of impairment, an ALJ has two avenues to assess whether that person can perform any other work within the economy. *Phillips*, 357 F.3d at 1239-40. The first avenue that an ALJ may use to make this determination is through application of the Medical Vocational Guidelines (grid rules). *Id.* However, reliance on the grid rules is inappropriate "when a claimant has non-exertional impairment that significantly limits his basic work skills…." *Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996). Examples of non-exertional impairments "include 'difficulty maintaining attention or concentrating,' and 'difficulty understanding or remembering detailed instructions.'" *Id.* at 1078. When a non-exertional impairment exists, the ALJ must consult a vocational expert. *Phillips*, 357 F.3d at 1242.

For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Vega v. Comm'r of Soc. Sec.,* 265 F.3d 1224, 1229 (11th Cir. 2001). An ALJ is not required to include limitations or

impairments unsupported by substantial evidence in the hypothetical posed to the vocational expert. *Turner v. Comm'r of Soc. Sec.,* 182 F. App'x 946, 950 (11th Cir. 2006).

## IV. FACTS

The claimant was 54 years old at the time of the ALJ's final decision. (R. 84). The claimant completed the ninth grade and later obtained his GED. (R. 85, 325). The claimant has eleven years of past relevant work as an eighteen-wheel truck driver but has not engaged in substantial gainful activity since early October 2009. (R. 86, 238, 266). The claimant alleges disability as of October 15, 2009, because of depression, suicidal thoughts, low blood pressure, severe knee pain, chronic ear infections, and recurrent MRSA infections. (R. 88-91).

*Physical and Mental Impairments*

On July 27, 2009, the claimant's wife called the police because she was afraid that the claimant would cause bodily harm to himself. The police transported the claimant to the emergency room at Teche Regional Medical Center. The claimant denied any suicidal thoughts and told attending physician Dr. Ryan Bird that he had no plan to cause bodily harm to himself. Dr. Bird's records state that the claimant was alert, able to obey commands, and had a blood pressure of 115/83. (R.540-547).

Two years later, on July 18, 2011, the claimant applied for disability insurance benefits based on a primary complaint of mood and anxiety disorders. (R. 99). On August 10, 2011, the claimant began outpatient treatment at Cheaha Mental Health Center. The claimant reported sleep deprivation, a lack of motivation, and feelings of depression and helplessness. The attending physician prescribed monthly therapy sessions for one-half to one hour "or as needed." (R. 434.)

The claimant returned to the Cheaha Mental Health Center on August 23, 2011, and September 27, 2011. At both visits, the claimant reported a feeling of general depression and difficulty sleeping. At the August 23 visit, attending physician Dr. Christopher Stanley prescribed 100 milligrams of Trazodone and 20 milligrams of Citalopram (Celexa), both antidepressants. At the September 27 visit, Dr. Stanley added a prescription for 0.5 milligrams of Clonazepam (Klonopin), also an anti-depressant. (R. 313, 432-33).

On October 19, 2011, Dr. Hasmukh Jariwala examined the claimant at the request of the Social Security Administration. At the time of this examination, the claimant was forty-nine years old. The claimant reported headaches, dizziness, and occasional blackout spells. Dr. Jariwala noted that the claimant did "not appear to be severely or acutely ill"; that he had a history of depression; that he was taking three anti-depressants for his depression; that his "ears, canals, and tympanic membranes are bilaterally normal"; that he suffered from hypertension;[1] and that he could answer and respond to normal conversation, squat "with minimal difficulty," and had 5/5 strength in the major muscle groups. (R. 435-38).

The claimant also received a mental examination in connection with his application for disability benefits at the request of the Social Security Administration. On October 25, 2011, psychologist Robert Summerlin, PhD noted that the claimant's wife was a commanding presence in their relationship and often had to be reminded to "allow her husband to answer…questions;" and that he was "oriented in regards to person, place, time, and circumstance." The claimant reported that he has three living siblings and two living children. (R. 440-41).

Dr. Summerlin asked the claimant to start at the number twenty and then count down, subtracting three each time. The claimant's responses were "17, 14, 11, 9, 6, 3" with one error

<hr>

[1] The court is unclear why Dr. Jariwala reported a diagnosis of hypertension for the claimant. At the appointment, Dr. Jariwala recorded the claimant's blood pressure as 110/74, which is within the normal range. Additionally, a diagnosis of hypertension contradicts the remainder of the claimant's record.

when subtracting three from the number eleven. Dr. Summerlin reported that the claimant had intact memory function and "logical, coherent, focused, and concrete" thought processes. Dr. Summerlin also noted that the claimant had the vocabulary and abstract thinking skills "of an individual with low average intelligence and approximately a high school education." The claimant described his mood as "[g]rouchy" and "nervous." (R. 441).

Next, the claimant and Dr. Summerlin discussed his daily physical activities. The claimant stated that he could drive, perform simple home repairs, shop with his wife, and watch television. The claimant's stated hobby was using the computer. The claimant also reported receiving around five hours of sleep each night and requiring assistance washing his hair and shaving. (R. 441).

Dr. Summerlin concluded that the claimant had a mood disorder, nicotine dependence, and moderate emotional symptoms affecting personal, social, and occupational functioning. Dr. Summerlin deferred diagnosis for antisocial, avoidant, and paranoid personality symptoms.[2] Finally, Dr. Summerlin concluded that the claimant had "adequate 'common sense' to manage disability money benefits. (R. 442).

On November 17, 2011, at the request of the Social Security Administration, Dr. Samuel Williams completed a RFC assessment of the claimant by reviewing his records. Dr. Williams found that the claimant had no limitations in his ability to remember locations and work-like procedures; understand and remember short and simple instructions; carry out short and simple instructions; perform activities within a schedule, be punctual, and regularly attend work; sustain a routine; make simple work-related decisions; complete a normal workweek or workday without interruptions; ask simple questions; get along with coworkers; maintain appropriate behavior;

---

[2] A deferred diagnosis is used when a patient exhibits some signs and symptoms of an actual diagnosis, but the treating physician defers diagnosis until he has the opportunity to examine the patient's symptoms on multiple occasions.

work around hazards and take precautions; travel in unfamiliar places; and set realistic goals. (R. 462-63).

Dr. Williams found that the claimant had moderate limitations in his ability to understand detailed instructions; maintain attention for extended periods; work in close proximity to others without getting distracted; interact with the general public; accept instruction; and respond appropriately to changes in the work environment. (R. 462-63).

Dr. Williams noted that the claimant had marked limitations in his ability to carry out detailed instructions. Dr. Williams concluded that the claimant could understand and carry out simple, short tasks, but would have difficulty with complex or detailed tasks; could maintain attention for at least two hours out of an eight hour day; should receive supervision "delivered in a positive manner"; should have only casual contact with the general public; and should be in a workplace where changes occur infrequently and gradually. (R. 464).

The Social Security Administration initially denied the claimant's application for disability on November 17, 2011. (R. 99).

The claimant returned to Dr. Stanley at the Cheaha Mental Health Center in January and February, 2012. Dr. Stanley noted the claimant's continued depression symptoms and noted new symptoms of claustrophobia. The claimant also reported that he had witnessed the death of his sister and felt like he was a burden on those around him. Dr. Stanley recommended that the claimant stay on the same course of treatment with Celexa, Klonopin, and Trazadone. (R. 466, 470).

On February 17, 2012, the claimant went to the Emergency Room at Brookwood Medical Center reporting suicidal thoughts and a potential nervous breakdown because of his sister's recent death. (R. 548). The claimant also reported that he had a plan to hang himself and that he

had an open knife lying by his bed. (R. 569). Security monitored the claimant and labeled him as a high risk for suicide. (R. 571). The emergency room doctors consulted with Dr. Stanley, who recommended that the claimant remain hospitalized to stabilize his mental health. The claimant, however, refused to remain hospitalized but his wife refused to let him sign a "Refusal of Hospitalization" form. The claimant and his wife left the hospital. (R. 560).

The claimant again returned to Dr. Stanley on February 28, 2012. Dr. Stanley noted that the claimant remained claustrophobic; represented that he had been shaking badly; was irritable; and had a plan to harm himself. Dr. Stanley continued the Celexa and Trazodone but switched the claimant from Klonopin to Xanax. (R. 467).

On March 18, 2012, the claimant went to the Northeast Alabama Regional Medical Center in Anniston Alabama, because of depression and suicidal thoughts. After a short period of time at the hospital, the claimant stated that he was no longer suicidal. The claimant's wife refused further care for the claimant, against the medical staff's recommendation, and they left. (R. 506).

The claimant then visited Dr. Stanley at Cheaha four times between March of 2012 and February of 2013. At each visit, Dr. Stanley recommended continuing the same course of treatment despite the claimant's representations that he had not been taking his medicine because he does not trust his family; he had a plan to jump off of a bridge but did not go to the hospital; the anti-depressants were affecting his sexual libido; he had bad thoughts and anxiety; he was unwilling to live in the same house as his daughter; he remained anxious "at times"; and he had begun having bad dreams. (R. 468-69, 482-83).

On June 26, 2013, the claimant saw Dr. Richard Sanders at UAB Hospital for chronic knee pain. Dr. Sanders performed an X-ray of the claimant's knee that showed calcification in

the patella tendon, but otherwise normal results. Dr. Sanders diagnosed this calcification as chronic patellofemoral dysfunction and recommended treatment of "[s]traight leg raising and hamstring stretching exercises." (R. 526).

The claimant then sought treatment from the Oxford Clinic, LLC on July 3, 2013, from Dr. Richard Snouffer for symptoms relating to low blood pressure, which was registered 85/59 on this date. The claimant also reported dizziness, ringing in the ears, tingling in his legs and arms, and feeling like he was going to pass out. The claimant stated that he "works outside and in the heat all day" and that his blood pressure had been dropping for the past four-weeks. Further, the claimant had yellow drainage coming out of his right ear that had a strong odor. (R. 489-91).

Dr. Snouffer noted that the claimant was oriented and able to sit comfortably without any noticeable pain but diagnosed him with depression, malaise, and fatigue. Dr. Snouffer also noted that he suspected that the claimant suffered from symptomatic bradycardia, but the patient refused admission to the emergency room to monitor this suspected condition. Dr. Snouffer prescribed a steroid to the claimant and requested that he return in one-week for a follow-up. (R. 489-91).

On July 7, 2013, the claimant saw Dr. Lauren McDougald at UAB Hospital.[3] The claimant complained of moderate chest pains with shortness of breath, heart palpitations, and blurred vision. Dr. McDougald performed a cardiac work-up that came back negative and noted that the claimant had a regular heart rate; no murmur; atypical symptoms of angina; and that the pain was most likely related to chest wall pain. Dr. McDougald discharged the claimant and told him to follow up as an outpatient with Birmingham Heart Clinic. (R. 516-18).

On July 9, 2013, the claimant returned to Dr. Stanley at the Cheaha Mental Health Center. The claimant's blood pressure was 80/64 and he reported that he was on steroids for his

---

[3] The court is unclear if the claimant was referred to Dr. McDougald or if he sought attention on his own behalf.

blood pressure; that he was taking only one trazadone per day; and that he was worried the Xanax was affecting his blood pressure. The claimant also complained about his depression, claustrophobia, and anxiety. Because he was only taking one per day, Dr. Stanley increased the dosage of Trazadone from 100mg to 150mg. (R. 475).

The claimant followed up with Dr. Snouffer at the Oxford Clinic on July 10, 2013. Dr. Snouffer recorded that the claimant continued to have low blood pressure that responded modestly to the medication. Dr. Snouffer recorded the claimant's blood pressure as 97/64. Dr. Snouffer also reported that the claimant mowed "his own grass with a push mower, taking about 2.5 h[ours] each time," noting that the last time the claimant mowed his lawn was three days prior to the visit. Dr. Snouffer recommended a thyroid panel but the patient declined this recommendation because he had inadequate finances. Dr. Snouffer told the patient to drink plenty of water, prescribed a steroid, and suggested a follow-up visit within two to four weeks. (R. 487-88).

Three weeks later, on July 31, 2013, the claimant followed up with Dr. Snouffer. The claimant reported that he was no longer experiencing dizziness or lightheadedness. But, the claimant also reported that his blood pressure was continuing to change daily. Dr. Snouffer's findings were that the claimant's hypotension was "responding well to the hydrocortisone" and that the claimant should continue taking the medication. Dr. Snouffer also found that the changes in the claimant's blood pressure seemed normal "especially given that he no longer feels the pre-syncopal feeling." (R. 492-94).

The claimant visited the Emergency Room at Northeast Alabama Regional Medical Center on December 27, 2013, complaining of an ear ache and drainage from his ear. Dr. Summer Phelps diagnosed the claimant with Otitis Media, an inflammation of the middle ear.

Dr. Phelps stated that this type of infection can occur shortly following a viral upper respiratory infection. Dr. Phelps prescribed Amoxicillin and Tramadol for pain. Dr. Phelps recommended that the claimant follow up with Dr. Jose Oblena at the Oxford Clinic within three days. (R. 507-10).

On January 14, 2014, the claimant visited Dr. Jose Oblena at The Oxford Clinic, LLC to follow up regarding his Otitis Media infection. At the time of this visit, the claimant's blood pressure was recorded as 106/70. Dr. Oblena reported that the claimant was well-developed and had no cardiorespiratory distress. As to the claimant's neurological abilities, Dr. Oblena stated that the claimant had strength of 5/5 in "all muscle groups." (R. 513). Further, the claimant was "conscious, cooperative and well oriented to time, place and person;" had no mood swings or psychotic features; and had good insight, memory, and judgment. (R. 513). Dr. Oblena diagnosed the claimant with Acute Suppurative Otitis Media and ordered X-rays of his chest, knees, and lower back that came back normal. (R. 511-13, 660-62).

On March 21, 2014, Dr. Oblena signed a letter stating the following: "Jerry Haynes…is a patient of mine at the Oxford Clinic. It is my medical opinion that Mr. Haynes is fully disabled from any type of employment because of his diagnosis of hypotension and his current mental state." (R. 535).

Dr. Oblena saw the claimant again for a follow-up appointment in June of 2014. The claimant sought medication refills and reported that he "feels like it's getting worse," presumably referring to his depression and anxiety. The claimant's prescriptions at this appointment were listed as Hydrocortisone, Vitamin B-12, Armour Thyroid, Ciprofloxacin antibiotics, Xanax, Aspirin, Celexa, Meclizine (an antihistamine), and Trazadone. (R. 700).

The claimant returned to Dr. Stanley on June 17, 2014, irritable, upset, anxious, and suffering from symptoms of claustrophobia and depression. Dr. Stanley recommended staying the course of treatment and maintained the prescriptions for Xanax, Celexa, and Trazadone. (R. 695). The claimant saw Dr. Stanley again on November 18, 2014. At this appointment the claimant stated that he wanted to reduce his daily medicine intake. The claimant, however, still claimed to be anxious and claustrophobic. Dr. Stanley recommended staying the current course of treatment. (R. 697). The claimant revisited Cheaha on October 13, 2014 to obtain refills on his medicine. (R. 620).

On December 17, 2014, the claimant admitted himself to the Emergency Room of Northeast Alabama Regional Medical Center. Dr. Ronald Shiver saw the claimant in response to complaints of an ear ache, a sore throat, and discomfort in his chest. The claimant's ear ache was described as a pain level of 10/10 and his ear was actively draining fluid. The hospital discharged the claimant and described him as alert, oriented, and stable. Dr. Shiver prescribed Azithromycin, an antibiotic, and two forms of steroid-based ear drops. Dr. Shiver also suggests the claimant follow up with his primary care physician. (R. 667-672).

The claimant sought treatment at the Emergency Room of Citizens Baptist Medical Center on January 11, 2015, complaining of vomiting, dizziness, and an earache. Dr. Pallavi Sunkavalli recorded the claimant's blood pressure as 133/96, diagnosed him with a stomach flu, gave him an injection of Zofran, and discharged him from the hospital. (R. 594-617).

The claimant followed up with the Oxford Clinic on April 2, 2015 to obtain medicine refills for his depression and ear infection. At this appointment, the claimant denied any chest pain or shortness of breath, but stated that his ear pain had subsided. (R. 623-26).

On May 5, 2015, the claimant saw Dr. David Wilson at Gadsden Psychological Services, LLC at the request of the claimant's attorney. The claimant stated that he asked for disability because he was "claustrophobic" and that when he was four years old he was "sexually abused" and put into a "slavery camp." The claimant stated that he contracted MRSA while transporting hazardous materials as a truck driver; tried to seek treatment at a psychiatric hospital "but they didn't have a bed. I tried to commit suicide but they didn't have no room;" and that the medicine he was taking helped but that it did not fully relieve his symptoms. Further, the claimant's wife stated that his low blood pressure "bottoms out to 50/39"; his ear pain causes dizziness; and that his knee needs replacing. She also stated that the claimant has thyroid and adenoid problems. Finally, she noted that the claimant tried to commit suicide four times. (R. 626-27).

Discussing his mental status, the claimant stated that he drove to the clinic that day even though both he and his wife have suspended driver's licenses; he goes through spells where he does not eat for four to five days; has hallucinations of his brothers and sisters and has conversations with them during these hallucinations even though they are deceased; will not ride in elevators because he is claustrophobic; is afraid of snakes and needles; often has panic attacks; and is depressed every day. The claimant's wife stated that the claimant "goes into outrages and there is no stopping him. The least little thing triggers it – I have had to call the law." Dr. Wilson noted that the claimant's speech was clear and normal in rate, but that he often interrupted the doctor. (R. 628-29).

Discussing his daily activities, the claimant stated that he gets up at 3am, makes coffee, and plays computer games; sometimes mows the lawn for fifteen minutes to an hour; maintains a garden; and gets tired very easily. As to his memory, the claimant could count down from twenty with one error, skipping the number sixteen and could perform simple math and a more complex

calculation. The claimant was, however, unable to count backwards from 100 by seven or recall any of three items after ten minutes. (R. 629-30).

Dr. Wilson concluded that the claimant was highly disturbed, depressed, paranoid, and has recurrent panic attacks with an onset date of October, 2009. Dr. Wilson stated that the claimant has a "highly impaired" ability to function within the pressures of an occupation and "would have great difficulty with the task and interpersonal aspects of any job." (R. 630)

*The ALJ Hearing*

On May 4, 2016, the ALJ held a hearing after the Appeals Council remand, at which the claimant and vocational expert David Head testified. The claimant testified that he had a tenth-grade education and had not worked since 2009 because of suicidal thoughts and suicide attempts. Additionally, the claimant stated that he drove to the hearing even though his license was suspended because his wife cannot drive and is on disability because of "heart problems and COPD." (R. 84-86).

The claimant testified that he is struggling to accept and cope with the death of all of his family members and experiences low blood pressure that has forced him to "do nothing but just lie around" fifteen days out of a thirty-day period. On these days, he testified that he spends about half to three-quarters of his day in bed and is unable to focus on a two-hour long movie. (R. 89).

The claimant stated that he gets "aggravated" and wants "to go crazy" when someone gives him direction, wants to "fight" and "throw stuff," and cannot follow simple instructions because he has to "do it [his] own way or…it won't get done." The claimant stated that treatment at the Cheaha Mental Health Center helps control his emotions and cope with familial deaths, but

that the doctors increased his medicine because it was "not working." He is unable to go out alone because he feels like people are making fun of him behind his back. (R. 89-90).

Next, the claimant testified that his knees often give out and he takes daily Advil for his knee pain. He claimed to need knee surgery eventually, but cannot afford it because he lacks insurance. The claimant testified that he has ear infections that are spreading to his thyroids, adenoids, and tonsils and would eventually require surgery. Finally, the claimant testified that he first contracted MRSA when transporting hazardous chemicals and that when his infections flare up he has to go to the hospital to get the sores cut off. (R. 91-92).

Next, the claimant testified that he has an irregular sleep schedule; wakes at all hours of the night because his sleep medicine is not working; only eats one meal per day; and does not have the energy to function normally during an average day. (R. 92).

The ALJ then posed several hypothetical questions to the vocational expert Dr. Head. The ALJ asked Dr. Head to assume a hypothetical individual with the same RFC as the claimant who could occasionally push or pull with the lower extremities; occasionally climb ramps and stairs; could perform simple routine and repetitive tasks; could deal with gradual changes in the work place; could perform jobs that did not deal primarily with people; could not tolerate more than occasional contact with the general public; could not climb ladders or scaffolds; must avoid vibration, noise, and extreme heat and cold; and must avoid unprotected heights and hazards. (R. 94).

The ALJ then asked whether a person with these limitations could perform the claimant's past work as a truck driver. Dr. Head testified that the hypothetical person could not perform the claimant's post work but could perform light, unskilled work as a sorter, with 1,850 statewide jobs and 93,000 jobs in the national economy; a housekeeper with 5,200 statewide jobs 215,000

available jobs in the national economy; or an assembly line worker with 2,100 statewide jobs and 130,000 available jobs nationally. (R. 94-95).

Next, the ALJ added several limitations to the hypothetical, specifically the inability to interact or respond appropriately with supervisors, coworkers, or the general public and the inability to respond appropriately to changes in routine work pressures or a routine work setting. Dr. Head testified that an individual with these additional limitations could not perform any work. (R. 96).

Dr. Head testified that a person could miss only two days per month for a period of several months without getting fired. He also testified that, if a person had to lie down fifteen days a month, that person could not perform any work. (R. 96-97).

*The ALJ Decision*

On August 16, 2016, the ALJ found that the claimant was not disabled, within the meaning of the Social Security Act, from October 15, 2009 through the date last insured. The ALJ found that the claimant was last insured on December 31, 2013. The ALJ also found that the claimant had not engaged in substantial gainful activity during the claimed disability period.

Additionally, the ALJ stated that the claimant had the following severe impairments: hypotension, depression, anxiety, thyroid disorder, otitis media, and chronic patellofemoral dysfunction of the left knee. The ALJ found that the claimant's alleged MRSA infections were not severe because the infections occurred prior to the alleged disability period and no evidence showed that they have occurred since. (R. 20-21).

The ALJ then found that the claimant's impairments or combination of impairments did not meet the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, the claimant's hypotension did not evidence systolic or diastolic failure, persistent

symptoms of heart failure, ischemic heart disease, coronary artery disease, or hypotension related organ damage; his thyroid problem caused no changes in blood pressure or heart rate, weight loss, or mood disorders; his otitis media did not impair hearing at a conversational level; and his left knee impairment did not prevent normal ambulation, walking at a reasonable pace, or utilization of public transportation. (R. 22).

The ALJ then looked to the claimant's mental impairments, both individually and in combination with his physical impairments, and found that the mental impairments also did not meet the severity of any listing. (R. 22-23).

The ALJ stated that the claimant had only mild restrictions in his daily living. The ALJ found that the claimant could perform personal hygiene, light housecleaning, and the laundry. Additionally, the ALJ noted that the claimant could shop, pay his bills, cook simple meals, and maintain a residence without supervision. The ALJ also found that the claimant's testimony that he was completely reliant upon his wife to perform even the simplest functions was inconsistent with testimony that his wife was physically disabled; that he had previously told a doctor that he mowed his own grass with a push mower; and that he does simple household repairs. (R. 23).

The ALJ found that the claimant has moderate difficulty in social settings. The claimant testified that he was paranoid and anxious during social activities, such as shopping. But, the claimant could also cooperate and communicate effectively with medical personnel. Thus, the ALJ found that the evidence showed no more than a moderate limitation. (R. 23).

The ALJ then found that the claimant experienced moderate difficulty with concentration, persistence, and pace. Specifically, the ALJ stated that although the claimant struggles with short-term memory, his mental status exam shows he has intact memory and logical, focused thought with no evidence of confusion, can sufficiently perform simple tasks timely and

appropriately. (R. 23). Because the claimant's physical and mental impairments did not meet a severity listing, the ALJ next determined the claimant's residual functional capacity.

The ALJ determined that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), such that the claimant could occasionally push or pull with the lower extremities, climb ramps and stairs, could perform simple routine and repetitive tasks, could deal with gradual changes in the work place and could perform jobs that did not deal primarily with people, but could not tolerate more than occasional contact with the general public and could not climb ladders or scaffolds, needed to avoid vibration, noise, and extreme heat and cold, and needed to avoid unprotected heights and hazards. (R.24).

To support this finding, the ALJ considered the claimant's medical and non-medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause the complained of symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects were not consistent with the evidence. Specifically, the ALJ noted that the claimant alleged that his low blood pressure and medication made him drowsy and sleepy but testified that he cannot sleep despite his prescription for sleep medication. The claimant also testified that his driver's license was suspended for not paying child support, but that he drives as necessary because his wife is unable to drive because of her disability; he has suicidal thoughts because of the death of his family, but the claimant still has living children. The ALJ also noted the claimant's current therapy at Cheaha Mental Health Center, his testimony about needing surgery for his knees and ears, and his claim that he cannot go out in public or handle criticism without losing his temper. (R. 24-25).

The ALJ found that the claimant's alleged impairments have very little medical support in the record near the time that he claimed the onset of these disabling conditions. Specifically,

the ALJ pointed to treatment at the Teche Medical Emergency Room in July of 2009, when the claimant's wife reported that she was afraid he would harm himself. But, the records of this visit show that the claimant was clean, ambulated without assistance, demonstrated normal moods, and denied any suicidal thoughts. The ALJ then noted that, after this 2009 visit, the claimant did not see another doctor for his alleged disabilities until after he filed his disability application in July, 2011. Then, in August, 2011 the claimant reported to Dr. Stanley that he needed help with "all my problems," specifically depression, sleep deprivation, feelings of helplessness, and lack of motivation. Dr. Stanley diagnosed the claimant with Generalized Anxiety Disorder and began prescription treatment. (R. 26).

The ALJ next discussed the claimant's medical history post-2011 and the inconsistencies reported at these visits. The ALJ noted that at Dr. Jariwala's visit in October of 2011, the claimant complained of several impairments but his cardiac work-up was negative; his blood pressure was in the normal range; he had no evidence of physical impairment; and he was not in a reactive emotional state. (R. 26).

The ALJ accorded Dr. Summerlin's opinion considerable weight. (R. 30). The ALJ then discussed how at the claimant's Social Security referred psychological evaluation, Dr. Robert Summerlin noted that the claimant suffered from a moderate mood disorder that suggested moderate difficulty in social or work functions but he had the common sense to manage disability funds if found eligible for such funds. (R. 26-27).

Next, the ALJ discussed the claimant's knee pain. The ALJ noted that no evidence existed in the record that any doctor had recommended knee surgery for his chronic patellofemoral dysfunction. But, the ALJ gave the claimant the "benefit of the doubt" regarding the claimant's knee calcification and thus limited the scope of the residual functional capacity to

light work. But, the ALJ noted that the claimant reported in July, 2013, that the claimant could cut his own grass, which was inconsistent with the testimony that he is unable to do any household chores and could only lie around during the day. (R. 28-29).

Discussing the claimant's low blood pressure, the ALJ noted that Dr. Snouffer prescribed a steroid that was having the desired effect; that the claimant's blood pressure had increased slightly; and that he reported an end to his headaches, dizziness, and other symptoms of low blood pressure. (R. 28).

As to the claimant's mental imparities, the ALJ found that the claimant had stable overall mental health with strong reactions to specific stressors, such as the death of his sister, the potential for going to jail over child-support, and family issues with his daughter. To cope with his irritability, the ALJ stated that the claimant should work primarily with things, not people. Additionally, the ALJ noted that treatment records suggested that the claimant could remember without difficulty and could carry out simple instructions. (R. 29).

The ALJ accorded little weight to the April, 2015, opinion of David Wilson, a consulting psychologist. The ALJ noted that Dr. Wilson found that the claimant had difficulty understanding, remembering, and carrying out short and simple instructions. But, the ALJ found this opinion to be inconsistent with the record. (R. 29). Specifically, the ALJ discussed how Dr. Summerlin reported that the claimant's thought processes were logical, coherent, focused, and concrete with responsive thought content. (R. 27). The ALJ found that the claimant's treatment records reflected intact concentration and memory with no indication of difficulty understanding, remembering, and carrying out simple instructions or tasks. (R. 29).

The ALJ also accorded little weight to Dr. Jose Oblena. The ALJ noted that Dr. Oblena saw the claimant only once and that at this appointment Dr. Oblena's notes state that claimant

was cooperative, well oriented, showed no signs of mood swings or psychotic features, and that the claimant showed good memory function. The ALJ found that Dr. Oblena's own notes contradicted his March, 2014 conclusion that the claimant is disabled. (R. 29-30).

The ALJ accorded considerable weight to the opinion of Dr. Robert Summerlin that the claimant had the common sense to manage disability benefits. (R. 30). The ALJ also accorded considerable weight to the opinion of Dr. Samuel Williams, the Social Security administration's consultative psychiatrist. The ALJ stated that Dr. Williams's opinions were well-supported by the evidence despite not having the claimant's full record at the time of examination.

Finally, the ALJ reported that he accorded little weight to the opinion of the claimant's wife. The ALJ found that the wife's claim that her husband was completely dependent on her was inconsistent with testimony that she is currently receiving disability benefits because of physical disabilities. (R. 30).

The ALJ then discussed the claimant's RFC and determined that a significant number of jobs exist in the national economy that the claimant would be able to perform. The ALJ relied on the vocational expert's testimony that, given the claimant's credible and supported limitations, he could perform light work such as a sorter, housekeeper, or assembly line worker. Thus, the ALJ found that the claimant was not disabled as of December 31, 2013, the date last insured. (R. 30-32).

## V. DISCUSSION

*Issue 1: The ALJ's Assessment of the Claimant's Credibility*

The claimant argues that the ALJ did not properly credit his subjective complaints about the limiting effects of his knee pain and mental impairments. This court disagrees and finds that the ALJ properly discredited the claimant's subjective complaints.

The ALJ properly articulated his reasons for discrediting the claimant's subjective testimony regarding his physical and mental disabilities. *See Brown*, 921 F.2d at 1236 (the ALJ must articulate his reasons when making a credibility determination). The ALJ determined that the claimant had medical impairments that could reasonably be expected to cause the alleged symptoms, but that the claimant's testimony regarding the limiting effects of these symptoms was not consistent with the medical evidence. (R. 25). The ALJ first relied on the medical evidence that partially contradicted the claimant's testimony. Even though the claimant claimed a disability as of 2009, the ALJ noted that the claimant had no medical records between his alleged onset date of October, 2009, and August, 2011; that the claimant's primary physician described the claimant as irritated, anxious, and claustrophobic, but often recommended continued treatment with anti-depressant drugs; that the claimant told his primary physician that the anti-depressant drugs were helping; and that the claimant was often described as coherent, ambulatory, and responsive to questions. (R. 25-28). The ALJ concluded that the medical evidence did not support claimant's testimony of having a debilitating mental illness and described the claimant as "stable overall with occasional exacerbations related to specific situational stressors." (R. 29).

The ALJ also took the claimant's testimony and past statements regarding his daily activities into account when determining the credibility of the claimant's subjective testimony. The ALJ noted that medical records do not support the claimant's testimony that the doctors told him he needed knee surgery; instead Dr. Sanders recommended that he perform leg stretches and leg raises. (R. 28). The ALJ also pointed to where the claimant told Dr. Snouffer in July, 2013, that he could, and had recently, used a push mower to cut his lawn. (R. 29).

The ALJ also identified inconsistencies in the record to support his findings discrediting the claimant's subjective statements about the limiting effects of his impairments. The ALJ noted that the claimant said he slept for long hours, fifteen days per month, but also had difficulty sleeping and was taking sleep medication; that he relied entirely on his wife for routine daily activities, but his wife was physically disabled and suffered from COPD; and that he had low blood pressure, but his blood pressure was often normal, was responding to treatment, and was no longer causing symptoms. (R. 23-28).

The court finds that the ALJ properly articulated his reasons for discrediting the claimant's subjective complaints and substantial evidence supports this finding.

*Issue 2: The ALJ's Assessment of Treating and Consulting Physicians*

The claimant next argues that the ALJ failed to accord the proper weight to the opinions of Dr. Jose Oblena and Dr. David Wilson. This court finds that the ALJ properly articulated his reasons for discrediting the opinion of Dr. Oblena and Dr. Wilson, and substantial evidence supports these reasons.

The ALJ properly articulated his reasons for discrediting the opinion of Dr. Oblena, the claimant's treating physician. *See Moore*, 405 F.3d at 1212 (the ALJ must articulate his specific reasons for failing to give controlling weight to a treating physician's opinion, and substantial evidence must support these reasons). The ALJ noted that the claimant had visited Dr. Oblena only once, for a follow-up appointment for otitis media, on January 14, 2014, prior to Dr. Oblena's letter concluding that the claimant was disabled. (R. 29). The ALJ also noted that Dr. Oblena's notes from this visit state that the claimant was "cooperative and well oriented with no mood swings or psychotic features" and had "good insight and intact memory and judgment." (R. 29-30). The ALJ also noted that the claimant's blood pressure was responding to treatment

and was recorded as 106/70 at the one visit with Dr. Oblena. (R. 30). These reasons constitute substantial evidence to support the little weight the ALJ gave to the conclusory letter from Dr. Oblena stating that the claimant was "fully disabled from any type of employment due to his diagnosis of hypotension and his current mental state."

The ALJ also properly articulated his reasons for discrediting the opinion of consulting psychiatrist Dr. Wilson, and substantial evidence supports those reasons. That ALJ first noted that Dr. Wilson's consultation occurred two-years after the claimant's last insured date. *See Mason*, 430 F. App'x at 832 (A medical opinion or examination that occurs after the "relevant disability period" is a "retrospective diagnosis that [is] not entitled to deference unless corroborated by contemporaneous medical evidence of a disabling condition."). Additionally, the ALJ noted that Dr. Wilson reported that the claimant had difficulty understanding, remembering, and carrying out short and simple instructions. But, the ALJ noted that this testimony was contradicted by Dr. Summerlin's report that the claimant's thought processes were logical, coherent, focused, and concrete with responsive thought content. Thus, the court finds that substantial evidence supports the ALJ's reasons for giving Dr. Wilson's opinion little weight.

*Issue 3: The ALJ's Assessment of Claimant's Residual Functional Capacity*

The claimant next contends that substantial evidence does not support the ALJ's assessment of the claimant's residual functional capacity. This court disagrees and finds that substantial evidence supports the ALJ's residual functional capacity finding.

The ALJ determined that the claimant has the residual functional capacity to perform light work. To support this finding, the ALJ discussed the medical record at length and stated that he considered all symptoms and the extent to which these symptoms can reasonably be

accepted as consistent with objective medical and non-medical evidence. The ALJ also stated that he considered opinion evidence. As discussed in the court's analysis for Issue 1, substantial evidence supports the ALJ's discrediting of the claimant's subjective statements about the limiting effects of his physical mental impairments. In his RFC finding, the ALJ correctly accounted only for the limitations he found credible. *See Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1270 (11th Cir. 2007) (noting that the hypothetical question must contain the claimant's impairments, but not "each and every symptom of the claimant."). The court finds that the ALJ properly considered the medical record as a whole in making his RFC determination and that substantial evidence supports the ALJ's assessment that the claimant has the residual functional capacity to perform light work.

### *Issue 4: The ALJ's Non-use of the Grid Rules and Hypothetical Questions*

The claimant next contends that the ALJ failed to properly apply the grid rules to determine whether work is available to the claimant in the national economy, instead relying on the testimony of the vocational expert. Additionally, the claimant contends that substantial evidence does not support the hypothetical questions the ALJ posed to the vocational expert. The court disagrees and finds that substantial evidence supports both of the ALJ's decisions.

The ALJ's non-reliance on the grid rules was correct. Because the ALJ found that the claimant had non-exertional limitations, the ALJ could not exclusively rely on the grid rules. *See Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985) ("Exclusive reliance on the grids is not appropriate…when a claimant has non-exertional impairments that significantly limit basic work skills.") The ALJ stated that because of the claimant's non-exertional limitations, he consulted a vocational expert to determine whether jobs existed in the national economy that the claimant could perform. (R. 31). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) (when the

claimant has non-exertional limitations, the preferred method to determine available work is through the testimony of a vocational expert.) Because the claimant has non-exertional limitations on his basic work skills, the ALJ properly consulted a vocational expert instead of exclusively relying on the grid rules.

Substantial evidence supported the questions the ALJ posed to the vocational expert. The first hypothetical question posed to the vocational expert included all of the limitations in the ALJ's residual functional capacity finding. (R. 24, 94-95). The vocational expert determined that a person with these limitations could perform light, unskilled jobs in the national economy. (R. 95). As discussed in Issue 3, substantial evidence supports the ALJ's assessment of the claimant's residual functional capacity. So, the ALJ properly relied upon the vocational expert's testimony in response to this hypothetical to determine that the claimant could perform light, unskilled work. Thus, this court finds that the ALJ posed a proper hypothetical question to the vocational expert that included all of the claimant's credible impairments. *See Graham v. Bowen*, 790 F.2d 1572, 1576 (11th Cir. 1986) (when a claimant fails to prove certain impairments, the ALJ is not required to include these impairments in the hypothetical question posed to the vocational expert). Thus, the ALJ's hypothetical questions to the vocational expert were proper, and substantial evidence supports the ALJ's finding on this issue.

## CONCLUSION

For the foregoing reasons, the court concludes that the ALJ applied the proper legal standards and substantial evidence supports his decision. The decision of the Commissioner should be AFFIRMED.

The court will enter a separate order to that effect.

DONE and ORDERED this 21st day of March, 2019.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE